**Ty S. DOUGLAS, Appellant,**

v.

**STATE of Alaska, Appellee.**

No. A–8799.

Court of Appeals of Alaska.

Dec. 22, 2006.

Paul Malin, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for the Appellant.

John A. Scukanec, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and David W. Márquez, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

## OPINION

STEWART, Judge.

Ty S. Douglas was convicted of two counts of first-degree sexual assault and two counts of fourth-degree assault.[1] Douglas argues that several of the court's trial rulings require reversing his convictions. But Douglas has not convinced us that any of the rulings he attacks constitute reversible error.

Douglas next argues that the prosecutor's final argument created plain error. But we are not convinced that the potential error was obvious to a competent lawyer or judge without objection or that, if error, it was so substantially prejudicial that failing to correct it would perpetuate a miscarriage of justice.

Douglas argues that his composite 45–year term with 15 years suspended was imposed by the superior court in violation of *Blakely v. Washington*.[2] We agree. Accordingly, we must remand the case to the superior court for reconsideration of the aggravating factors in compliance with *Blakely*.

### Background facts and proceedings

Douglas had a "stormy" and "on-again/off-again boyfriend/girlfriend" relationship with K.I. K.I. had an alcohol problem that led to a felony assault conviction for driving while intoxicated and causing an accident that injured another person. (K.I. was on probation for this offense at the time of trial.) Douglas and K.I. first met in Seattle in 2001. K.I. returned to Ketchikan in December 2001, and Douglas followed soon thereafter.

In early 2002, K.I. obtained a domestic violence restraining order against Douglas.

In March 2002, Douglas reported to the Ketchikan police that K.I. was involved in a sexual relationship with a Ketchikan police officer. Douglas claimed that K.I. and the officer had called Douglas and made him listen while they had sex, and that the officer had made threatening phone calls to Douglas. An investigation revealed no evidence to support these allegations, and Douglas was ultimately convicted of making a false report.

About two weeks later, Douglas went to K.I.'s apartment and assaulted her. He hit and choked her, dragged her into the bedroom, and demanded to have sex with her. She managed to escape to a neighbor's apartment and call the police. As a result, Douglas was convicted of fourth-degree assault.

On June 26, 2002, K.I. went to visit a neighbor, Walter Hinman, to show him her new cell phone. While she was there, the cell phone rang, but K.I. did not know how to answer it so she left it on the table and continued to talk with Hinman. K.I. did not know that it was Douglas who was calling, and K.I. unknowingly answered the phone so that Douglas could overhear the conversation she was having with Hinman. When she returned to her apartment a few minutes later, Douglas was there waiting for her. Douglas accused her of having sex with Hinman.

Douglas threw K.I. down on her couch and ripped her pants off. K.I. testified that Douglas then "ferociously" penetrated her vagina with his hands and fingers. She told him to stop, and that he was hurting her, but he told her she "just fucked everybody in town" and asked "How does that [feel]? How do you like this? Is this better ... ?" He also hit her in the face, causing blood to splatter onto the couch and wall. Douglas left the apartment, but K.I. did not immediately report the assault to the police.

The next day, June 27, K.I. was in her apartment visiting with another neighbor, Zeneida Galeon. Douglas arrived, and

---

1. AS 11.41.410(a)(1) & AS 11.41.230(a)(1), respectively.

2. 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004).

watched as K.I. allowed Galeon to use K.I.'s car to drive to a local store. When Galeon left, Douglas argued with K.I. about loaning the car to neighbors and then assaulted her again. He struck her in the head and face with his fists, threw her on the floor, and penetrated her vagina with his penis. She tried to fight back. He attempted to penetrate her anus with his fingers and penis. He then again violently penetrated her vagina, all the while calling her a "slut" and a "whore," and telling her that "you fuck everyone in town." He grabbed her by the hair and pounded her head into the floor, pulling large clumps of her hair out. K.I. pretended to be unconscious, but he continued to punch and kick her.

While Douglas was still there, Galeon returned from the store and knocked on the door. K.I. opened the door, and Galeon testified that K.I. was "bloody, naked, [and covered with] bruises," with clumps of hair on her shoulders. Galeon called the police. Florence Galeon, Zeneida's daughter, heard yelling and came upstairs to K.I.'s apartment and saw Douglas running down the stairs.

When the police arrived at K.I.'s apartment, K.I. reported that she had been raped. She was taken to the hospital and treated by Dr. Ernest Meloche. His examination and that of the nurse revealed tears and lacerations around K.I.'s anus, swelling and bruising around her anal and vaginal areas, burns on the backs of her legs and buttocks, and blood on her scalp where clumps of hair had been torn out. Dr. Meloche testified that K.I. had "the most traumatized perineum [he] had seen in 25 years." The doctor also concluded, based on blood and fecal matter found on K.I.'s labia and thighs, that something had first penetrated her anus and then reentered her vagina. Tests later conducted by the state crime lab found DNA samples from K.I.'s vaginal swabs that matched Douglas's DNA profile, and also found blood on Douglas's clothing that was consistent with blood samples from both Douglas and K.I.

The police found Douglas a short time after the assault at a local motel. When a police officer knocked on his door, Douglas jumped from his second-floor window, but another police officer caught Douglas and arrested him. A police officer testified that Douglas appeared to have been drinking and that he had scratches and bruises on his neck, shoulders, back, and upper arms, and an injury to his right thumb.

At trial, Douglas was convicted of two counts of first-degree sexual assault and two counts of fourth-degree assault. Superior Court Judge Larry Weeks imposed the composite 30–year term to serve. Douglas appeals.

### Discussion

*Douglas's attack on the superior court's evidentiary rulings*

Douglas argues that Judge Weeks violated his constitutional rights to due process, to compulsory process, and to present his defense in the fullest possible manner when Judge Weeks prohibited Douglas from presenting evidence of noise complaints from K.I.'s neighbors, telephone calls wherein K.I. allegedly pretended to have sex with another man, and K.I.'s alleged false accusation that a Ketchikan police officer sexually assaulted her.

Before opening statements, Judge Weeks ruled that Douglas could not inquire about K.I.'s prior sexual conduct "without prior application to the court." Judge Weeks also advised the parties that they could not refer to allegations of prior false reports of sexual assault by the victim without complying with the applicable case law.

Before cross-examining K.I., Douglas requested permission to ask K.I. about phone calls and conversations she had with Douglas in which she purportedly pretended to have sex with another man and falsely claimed that she had been raped by a Ketchikan police officer. Douglas maintained that this "game playing [that was] going on back and forth between the parties . . . helped [lead] up to" the assault and false report charges. He argued that the material was relevant to the "credibility and veracity of the witness" and that it "show[ed] the entire relationship between these two parties, going back and forth and back and forth, with false allegations and fighting with each other." He ar-

gued that the rape accusation was an attempt to "get sympathy, to keep him from leaving." He also argued that the evidence helped rebut the prosecution's portrayal of Douglas as a stalker, and showed that K.I. invited many of the contacts herself.

The prosecutor responded that K.I. denied making these statements, that the information was not relevant, and that this evidence did not meet the standards established for the admissibility of false reports of sexual assault.[3]

Judge Weeks ruled that Douglas could cross-examine K.I. generally about the phone calls and conversations to illustrate the dynamics of the relationship, but prohibited him from asking her specifically about pretending to have sex with another man or the alleged false report of sexual assault.

Douglas also sought permission to admit evidence that K.I.'s neighbors submitted noise complaints about her between August and October, 2002 (after the sexual assaults charged in the indictment took place). Douglas asserted that this evidence was relevant in several ways: (1) it was relevant to K.I.'s testimony that she had received more noise complaints than she described in her testimony; (2) it rebutted the inference that "everything that had happened was [because of] Ty Douglas, and that the only reason she had problems was Ty Douglas"; (3) it rebutted the prosecution's suggestion that the case was about "good neighbor[s]," and tended to show K.I. was a bad neighbor; (4) it was relevant to K.I.'s "credibility and veracity"; and (5) it was "[p]roof of these constant problems and her state of mind during that whole period of time, that it didn't change before or after, it was all the same thing."

Judge Weeks also ruled that evidence of the noise complaints from K.I.'s neighbors was irrelevant, and "to the extent that you're talking about contradicting things that [K.I.]

said, that it's collateral. And to the extent that there's a balancing test involved, I believe that the prejudice outweighs ... the probative [value]."

Douglas asserts that his constitutional rights to due process and compulsory process were violated by Judge Weeks's rulings. He notes that the right to present evidence is a right guaranteed by the Fifth and Fourteenth Amendments of the United States Constitution and article I, section 7 of the Alaska Constitution.[4]

Douglas maintains that "K.I.'s veracity and credibility was *the* critical issue at trial. Thus the evidence that Douglas proposed about K.I.'s conduct before, during, and after the offense was critically important to his defense." He argues that K.I.'s credibility was central to the prosecution's case and that without the excluded evidence he was unable to fully present his own theory in defense. For example, he presented evidence that there was no sperm on K.I.'s oral or rectal swabs, that the sperm found on K.I.'s vaginal swab could "easily [be] in excess of 10 days" old and thus could have resulted from consensual sex, and that Douglas's penile swab did not contain any DNA "foreign to Mr. Douglas." He theorized that K.I. could have had consensual sex and then been physically assaulted afterwards. Whether there was in fact a sexual assault, Douglas argues, depends on K.I.'s credibility, and the excluded evidence was necessary to thoroughly investigate the matter.

Even if Douglas's assertions are true, it is unclear how Judge Weeks abused his discretion in determining what evidence was relevant, collateral, or overly prejudicial. This court has recognized that the admission of all evidence, even evidence introduced to show a witness's bias or motivation, is subject to the balancing test enumerated in Alaska Evidence Rule 403.[5] The rule allows the exclu-

---

**3.** *See Morgan v. State,* 54 P.3d 332, 339 (Alaska App.2002) (adopting a "preponderance of the evidence" standard for a showing that the complaining witness has made a prior knowingly false accusation of sexual assault); *Covington v. State,* 703 P.2d 436, 442 (Alaska App.1985) (holding that courts may allow evidence of false prior allegations of sexual assault when "the charges

somehow had been disproved or where the witness had conceded their falsity").

**4.** *See Shepard v. State,* 847 P.2d 75, 83 (Alaska App.1993).

**5.** *Lerchenstein v. State,* 770 P.2d 1150, 1153 (Alaska App.1989).

sion of evidence, regardless of its relevance, when "its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury."[6] Here, it is reasonable to conclude, as Judge Weeks did, that the evidence Douglas sought to present would have unnecessarily shifted the focus of the trial from the events surrounding the charged offenses toward incidents that have limited probative value.

■ Judge Weeks allowed Douglas to question K.I. about the phone calls generally, providing Douglas the opportunity to explore the dynamics of their relationship. It is true that in a sexual assault case information about the relationship between the victim and the accused is often material, but the purposes that Douglas asserts for introducing the specifics of these phone calls, including a demonstration of the "game playing" and "back and forth" nature of the relationship, were served by other admissible and less prejudicial evidence. The additional probative value of this particular evidence, then, was considerably outweighed by its prejudicial effect. It was therefore reasonable, and not an abuse of discretion, for Judge Weeks to exclude evidence of the alleged phone call where K.I. purported to have sex with another man.

■ Douglas's argument regarding the alleged false rape report is particularly unpersuasive. Douglas presented no evidence, except for his own allegation, that K.I. had ever claimed to have been raped by a Ketchikan police officer. Furthermore, Douglas's attorney informed Judge Weeks that she was not going to present any evidence (besides Douglas's claim) on that issue. Shortly thereafter, when the prosecutor was reviewing the various rulings from the court, Judge Weeks reminded the prosecutor that Douglas's attorney said she was not going to inquire into K.I.'s sexual conduct. Douglas's attorney did not contradict Judge Weeks. And almost immediately thereafter, Judge Weeks asked Douglas's attorney if there were any other issues on cross examination and the attorney responded: "No, not at this point." We con-

clude that Douglas did not preserve the issue regarding K.I.'s purported claim that she had been sexually assaulted by a member of the Ketchikan police.

■ We also reject Douglas's argument that the exclusion of the noise complaints significantly hindered his defense. While the complaints might help depict K.I. as a hard-drinking, noisy neighbor who manipulated Douglas as much as he manipulated her, other admissible evidence already established those points. For example, K.I. admitted that she had received noise complaints, that she had a drinking problem, that she and Douglas frequently had consensual sex, and that she had paid for Douglas to fly back to Ketchikan from New Orleans *after* the first assault conviction.

We conclude that Judge Weeks did not abuse his discretion by excluding the evidence regarding noise complaints.

*Douglas's attack on the prosecutor's final argument*

■ Douglas argues that the prosecutor's final argument violated his constitutional rights because it improperly described the presumption of innocence and commented on his right to remain silent.

■ The prosecutor started the rebuttal portion of his closing argument as follows:

It is true that Mr. Douglas *formerly* enjoyed—I'm sorry, may it please the court, Ms. Swanson, ladies and gentlemen of the jury. It is true that Mr. Douglas *formerly* enjoyed the presumption of innocence, which is to say he's innocent until proven guilty, until proven guilty. Proven guilty by the sworn statements of witnesses and by the other evidence that you've seen.

Douglas did not object. Because he did not object to the prosecutor's statements at trial, he must now show plain error.[7] To establish plain error, Douglas must show that the error "is one that is (1) so obvious that it must have been apparent to a competent judge and a competent lawyer even without an

---

6. A.R.E. 403.

7. *Kailukiak v. State*, 959 P.2d 771, 779 (Alaska App.1998), *abrogated on other grounds by Harmon v. State*, 11 P.3d 393 (Alaska App.2000).

objection and (2) so substantially prejudicial that failing to correct it on appeal would perpetuate a miscarriage of justice." [8]

█ The prosecutor's statements regarding the presumption of innocence were incorrect. The presumption of innocence remains in force throughout the presentation of evidence and the closing arguments, and it governs the jury's deliberations.[9]

However, in Douglas's case, the jury was instructed as follows:

The distinguishing features of a criminal trial are what are known in the language of the law as the presumption of innocence and the burden of proof beyond a reasonable doubt. The law presumes a defendant to be innocent of crime. Thus, a defendant, although accused, begins the trial with a clean slate—with no evidence favoring conviction. The presumption of innocence alone is sufficient to acquit a defendant, unless you are satisfied beyond a reasonable doubt of the defendant's guilt, after careful and impartial consideration of all the evidence in the case.

In *Brown v. State*,[10] the Alaska Supreme Court held that comments similar to the prosecutor's did not amount to plain error because the jury instructions made it clear that the presumption of innocence remained in effect throughout the trial and jury deliberations.[11]

Although the prosecutor's statement in Douglas's case was wrong, the jury was given proper instructions regarding the presumption of innocence. From our review of the record, we conclude that the prosecutor's brief comment was not so substantially prejudicial that failing to reverse Douglas's conviction creates a miscarriage of justice.

█ Douglas also argues that the prosecutor improperly commented on Douglas's right to remain silent.

During trial, the State introduced evidence of statements Douglas made (a) at the time of his arrest, (b) during the omnibus hearing in a separate witness tampering case, and (c) at a pretrial hearing in the present case. Douglas did not object to this evidence. At trial, when discussing one of the tapes of prior proceedings, Judge Weeks warned the prosecutor that he should not comment on Douglas's right to remain silent. The court said:

You're not at any time to comment in any way on [Douglas] not responding to questions, or his right to counsel, or the Fifth Amendment. You're not at any time to say anything about [ ] those things that are on the tape. To the extent that they're played, the jury may hear those. You're not—it's not to come out of [your] mouth at any time about any of those kinds of rights.

However, during closing argument, the prosecutor made the following comment to the jury while referring to the recordings and evidence of Douglas's statements:

[I]t's interesting, this is November of 02, he's had months now, he's had months to formulate how do I talk my way out of this; how do I explain this.

Later, the prosecutor said:

Four months, he's got four months to think ["]how am I going to explain this. Right out of the window, I said she's psychotic; right off the bat, I said she's crazy. I also said Ms. Galeon was crazy because if they believe Ms. Galeon, I'm in as much trouble as if they believe her. How am I going to explain this?["] So four months later, for the first time, he offers the bite theory and the menses theory in the same hearing, the one that the judge—well, you'll hear— you've heard it.

Douglas did not object to either statement. Because Douglas did not object at trial, he must now show plain error.[12]

We have held that "a person who is under arrest for a crime cannot normally be im-

8. *Potts v. State*, 712 P.2d 385, 390 (Alaska App. 1985); *see also Massey v. State*, 771 P.2d 448, 453 (Alaska App.1989).

9. *Brown v. State*, 601 P.2d 221, 225 (Alaska 1979).

10. 601 P.2d 221.

11. *Id.* at 225–26.

12. *Kailukiak*, 959 P.2d at 779.

peached by the fact that he was silent following his arrest."[13] But here, the prosecutor did not ask the jury to draw any unfavorable inference because Douglas elected to assert a constitutional right.

The statements the prosecutor attributed to Douglas reflected evidence admitted during trial. The State introduced evidence of statements Douglas made at the time of his arrest, and Douglas did not object. The arresting officers testified that Douglas had made statements that "[K.I.] is on psychotic medications," and that K.I. "was crazy" and that Galeon "was also crazy." The State admitted the audiotape made while Douglas was processed at the police station. Douglas did not object to the admission of the tape. In fact, the State offered the tape in evidence after Douglas established during cross-examination of one of the police officers that Douglas was *"Mirandized"* by the police and then asked for an attorney. Although an officer testified that he advised Douglas not to discuss the case because he asked for an attorney, Douglas continued to ask questions and talk about the situation.

The State also offered the electronic recordings of Douglas's in-court statements from two different hearings that contained statements about the case. Douglas did not object to the admission of either recording.

We reject Douglas's contention that the prosecutor improperly commented on Douglas's right to remain silent. Douglas voluntarily offered a variety of comments after he was arrested. During cross-examination, Douglas's attorney brought out the fact that after the police started to advise Douglas of his *Miranda* rights,[14] he asked for an attorney. Even though the police advised Douglas not to talk about the case because he had asked for an attorney, Douglas continued to discuss the case. The State introduced evidence of Douglas's statements during this process and Douglas did not object to the admission of the tape.

We conclude that the prosecutor's argument was a fair comment on the evidence admitted in the case. Douglas, whenever he chose to speak about his case before trial, never mentioned the theories he eventually proposed during trial. The prosecutor's statement did not attack Douglas's decision to remain silent; instead it attacked Douglas's decision to speak, specifically his history of ever-changing theories. Although the Fifth Amendment protects Douglas's right to remain silent before and during trial, it does not immunize his speech from later criticism. The prosecutor's criticism was not in error.

*Douglas's argument regarding the admission of his prior assault conviction*

■ The superior court admitted evidence that Douglas had a fourth-degree assault conviction for assaulting K.I. when a domestic violence restraining order was in effect. Douglas argues that the superior court erred by not explicitly weighing whether the probative value of this evidence was outweighed by its prejudicial impact. Douglas also argues that even if the evidence was admissible, the superior court should have given the jury a limiting instruction on the proper use of this type of evidence.

Before trial, the State filed notices of its intent to offer evidence of Douglas's prior bad acts, including the assault mentioned above, under Evidence Rule 404(b)(4). Douglas opposed and specifically objected (before the jury was selected) on the grounds that the probative value of the prior assault was outweighed by its prejudicial impact. Judge Weeks implicitly rejected that argument when he ruled that the assault conviction was admissible, but did not conduct the probative value/prejudicial impact balancing test on the record.

During trial, the State offered evidence of the assaultive conduct and conviction for that conduct, and discussed it during opening and closing arguments. Judge Weeks did not give a limiting instruction to the jury regarding this evidence of prior bad acts.

**13.** *Nelson v. State*, 691 P.2d 1056, 1059 (Alaska App.1984); *see also Davis v. State*, 501 P.2d 1026, 1030–31 (Alaska 1972).

**14.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

In *Bingaman v. State*,[15] we established requirements for a trial court to apply when admitting evidence of other crimes of domestic violence under Evidence Rule 404(b)(4). According to *Bingaman*, in cases involving domestic violence, "evidence of other crimes involving domestic violence by the defendant against the same or another person ... is admissible."[16] However, we held that the admission of such evidence is only constitutional if it is limited: "The trial judge must still ensure that the defendant is tried for the crime currently charged—not for the things that the defendant might have done on other occasions, and not for the kind of person that the defendant might be."[17] This required the trial court to explicitly conduct the balancing test required under Evidence Rule 403 and explain that analysis on the record.[18] Furthermore, if the court decided the evidence was admissible, the court was required to instruct the jury that the evidence of the defendant's other acts is not sufficient, standing alone, to justify the defendant's conviction.[19]

Douglas's prior assault was committed a few months before the assault in the present case, and was committed upon the same victim. The superior court admitted evidence of this assault under Evidence Rule 404(b)(4)—*i.e.*, to prove Douglas's propensity to commit domestic violence. But conceivably, this evidence was also independently admissible under Evidence Rule 404(b)(1) to prove the nature of Douglas's relationship with K.I.

In any event, Douglas did not ask the superior court to give the cautionary instruction described in *Bingaman*: the instruction that evidence of other acts of domestic violence, standing alone, is insufficient to support a defendant's conviction. Even though we described this instruction as mandatory in *Bingaman*, we now hold that this instruction is mandatory only if the defendant requests it, or when the amount and nature of other-crimes evidence introduced against the defendant demonstrates that the failure to give this instruction would amount to plain error.

In a typical case, even when evidence of a defendant's other crimes is introduced under Evidence Rule 404(b)(4) (*i.e.*, introduced to prove the defendant's character), the defendant's trial will remain fair even in the absence of a *Bingaman* instruction. Our decision in *Bingaman* was not based on the perception that, absent this type of instruction, the defendant's trial would always be tainted by due process error. Rather, the purpose of the *Bingaman* instruction is to amplify a principle that is already contained in the standard jury instructions: that the jury must not find the defendant guilty unless the government proves the crime charged in the indictment. Except in extraordinary cases like *Bingaman*, we trust that juries will not lose sight of this principle even where evidence of other crimes is admitted under Rule 404(b)(4).

The facts of Douglas's case do not approach the kind of extraordinary circumstances found in *Bingaman*—where, as we described in our opinion, "only twenty percent of the testimony presented at [the defendant's] trial dealt with the acts ... charged [in the indictment, and the] remaining eighty percent of the testimony dealt with other acts or occurrences."[20] And, as we noted above, Douglas did not request a *Bingaman* instruction.

Under these circumstances, the trial judge did not commit plain error by failing to give a *Bingaman* instruction *sua sponte*.

### Douglas's cumulative error argument

Douglas maintains that even if none of the claims he raised establishes reversible error by itself, the cumulative effect of the individual errors warrants reversal of his conviction.[21]

---

**15.** 76 P.3d 398 (Alaska App.2003).

**16.** *Id.* at 406, (quoting A.R.E. 404(b)(4)).

**17.** *Id.* at 414.

**18.** *Id.* at 416.

**19.** *Id.* at 416–17.

**20.** *Id.* at 402.

**21.** *See Roussel v. State,* 115 P.3d 581, 585 (Alaska App.2005).

However, to the extent that we agree with Douglas that the superior court erred, the errors are minor or technical, and not overly prejudicial. We therefore reject Douglas's cumulative error argument.

### Sentencing issues

The jury convicted Douglas of two counts of first-degree sexual assault (an unclassified felony which, at the time of Douglas's crimes, carried a maximum penalty of 30 years on each count) and two counts of fourth-degree assault (a class A misdemeanor with a maximum sentence of 1 year).[22] Douglas was a first felony offender for purposes of presumptive sentencing and was subject to a presumptive 8–year term for each sexual assault.[23]

The State alleged seven aggravating factors under AS 12.55.155(c), and the judge found the following six: (c)(1) (K.I. sustained physical injury as a result of the sexual assault); (c)(2) (Douglas's conduct manifested deliberate cruelty to K.I.); (c)(5) (Douglas knew K.I. was particularly vulnerable due to disability); (c)(8) (Douglas's prior criminal history included conduct involving aggravated or repeated instances of assaultive behavior); (c)(10) (Douglas's conduct was among the most serious conduct within the definition of first-degree sexual assault); and (c)(28) (K.I. had provided evidence related to prior offenses committed by Douglas). Judge Weeks rejected aggravating factor (c)(18)(A), that the offenses were committed against a spouse or a member of the same social unit living together.

Judge Weeks found that Douglas had a "profound antisocial nature," and that he was a "particularly violent and dangerous" offender. Judge Weeks concluded that the sexual assaults were "reprehensible and destructive" to both K.I. and the community, and found that Douglas was a worst offender[24] with no likelihood of rehabilitation. Judge Weeks sentenced Douglas to a 30–year term with 15 years suspended on each of the first-degree sexual assault convictions; the unsuspended 15 years to serve on each count was imposed consecutively and the suspended time on each count was imposed concurrently. He also sentenced Douglas to 1–year sentences on each fourth-degree assault conviction, to run concurrently with the time to serve on the first-degree sexual assault convictions, resulting in a composite 30–year term to serve.

■ We first address Douglas's argument that a composite 30–year term to serve is excessive.

The record fully supports Judge Weeks's findings regarding Douglas's worst offender status (described above). Even though Judge Weeks found that Douglas was a worst offender, thereby justifying the imposition of a maximum term, he did not impose the maximum possible sentence for Douglas's two sexual assault convictions.

Judge Weeks did impose the unsuspended imprisonment for each sexual assault consecutively. However, at the time of Douglas's sentencing in April 2004, a sentencing judge's authority to impose consecutive sentences was governed by former AS 12.55.025(e) and (g).[25] These two sections required consecutive sentences in certain circumstances, but in all other instances a sentencing judge had the discretion to impose sentences consecutively or concurrently. Both this court and the Alaska Supreme Court construed former AS 12.55.025(e) and (g) as creating a preference for consecutive sentences, which a sentencing judge had the discretion to reject.[26]

---

**22.** See former AS 12.55.125(i); AS 12.55.135(a).

**23.** See former AS 12.55.125(i)(1).

**24.** See State v. Wortham, 537 P.2d 1117, 1120 (Alaska 1975) (holding that a maximum sentence should not be imposed without some foundation for characterizing a defendant as the worst type of offender and listing some of the factors which could support such a characterization).

**25.** The legislature repealed these sections in 2004 and replaced them with AS 12.55.127. See SLA 2004, ch. 125, § 7 (effective July 1, 2004).

**26.** See State v. Hodari, 996 P.2d 1230, 1233 (Alaska 2000); Contreras v. State, 767 P.2d 1169, 1174 (Alaska App.1989); Jones v. State, 744 P.2d 410, 411 (Alaska App.1987); State v. Andrews, 707 P.2d 900, 909 (Alaska App.1985), aff'd, 723 P.2d 85 (Alaska 1986).

Douglas argues that his composite term is excessive when it is compared to the sentence the defendants received in three reported cases: *Lewis v. State,*[27] *Goolsby v. State,*[28] and *Mosier v. State.*[29] Each of these cases relied on a sentencing range of 10 to 15 years' imprisonment for aggravated sexual assaults recognized by this court in *State v. Andrews.*[30] However, in *State v. Wentz,*[31] and again in *State v. Hodari,*[32] the Alaska Supreme Court emphasized that the proper focus of sentence review is whether the sentence imposed falls within a range of reasonableness that:

> should be determined not by imposition of an artificial ceiling which limits a large class of offenses to the lower end of the sentencing spectrum, but, rather, by an examination of the particular facts of the individual case in light of the *total range of sentences authorized by the legislature for the particular offense.*[33]

Applying that standard, and considering Judge Weeks's careful evaluation of the sentencing criteria that applied to Douglas's case, we conclude that the imposition of a net 30–year term to serve is not clearly mistaken.[34]

Next, Douglas argues that Judge Weeks violated the rule set out in *Juneby v. State*[35] and AS 12.55.155(e) when Judge Weeks found the (c)(1) "physical injury" aggravator based on conduct for which Douglas had been separately convicted of fourth-degree assault.

The jury convicted Douglas of two counts of fourth-degree assault based on conduct that occurred at roughly the same time as each sexual assault. During the sentencing proceeding, the prosecutor alerted Judge Weeks to the issue addressed in *Juneby,* namely that a sentencing court should not find an aggravating factor based on conduct for which the defendant is being separately punished. The prosecutor asked Judge Weeks to enter findings to indicate that he acknowledged *Juneby.* Judge Weeks found aggravator (c)(1)—that a person other than an accomplice sustained physical injury—by clear and convincing evidence but made no findings or comments about the relationship of (c)(1), *Juneby,* and AS 12.55.155(e).

The State argues that any potential error does not require resentencing because, even though Judge Weeks found the aggravator, he did not rely on that aggravator when imposing the sentence. Both parties cite *Anderson v. State,*[36] a case in which this court remanded for resentencing because it was not clear from the contemporaneous record whether the sentencing judge would have exercised his discretion in the same way had he realized that *Juneby* prohibited him from relying on the disputed aggravator.[37] Judge Weeks made no mention of (c)(1) when he imposed the sentence. On the other hand, since Judge Weeks made no explicit *Juneby* findings, it is not clear if Judge Weeks relied on the aggravating factor at all. However, because we are remanding the case for the other reasons expressed below, Judge Weeks will have the opportunity to expressly address the *Juneby* issue.

Next, we address several issues Douglas raises based on *Blakely v. Washington.*[38] In *Blakely,* the United States Supreme Court held that "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized

---

**27.** 706 P.2d 715 (Alaska App.1985).

**28.** 739 P.2d 788 (Alaska App.1987).

**29.** 747 P.2d 548 (Alaska App.1987).

**30.** 707 P.2d at 912–13.

**31.** 805 P.2d 962 (Alaska 1991).

**32.** 996 P.2d 1230 (Alaska 2000).

**33.** *Wentz,* 805 P.2d at 965 (emphasis in original); *see also Hodari,* 996 P.2d at 1232–33.

**34.** *See McClain v. State,* 519 P.2d 811, 813–14 (Alaska 1974) (holding that an appellate court is to uphold a sentencing decision unless the sentence is clearly mistaken).

**35.** 641 P.2d 823 (Alaska App.1982), *modified in part,* 665 P.2d 30 (Alaska App.1983).

**36.** 123 P.3d 1110 (Alaska App.2005).

**37.** *Id.* at 1121.

**38.** 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004).

by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." [39]

Douglas argues that *Blakely* applies to a sentencing judge's election to impose consecutive sentences. However, in *Edmonds v. State*,[40] we held that *Blakely* does not affect that decision.[41] Douglas also argues that *Blakely* prohibits judges from making "worst offender" findings. Whatever the merit of Douglas's argument, Judge Weeks was not obliged to find that Douglas was a worst offender to impose the composite term that Douglas received because Judge Weeks did not impose the maximum sentence for any of Douglas's individual crimes.

 The issue remains whether any of the aggravators relied on by Judge Weeks was *Blakely*-compliant. In *Cleveland v. State*,[42] we held that *Blakely* is satisfied if at least one aggravating factor is established by the jury's verdict, by a defendant's concession, or by the existence of a defendant's prior convictions.[43]

The State contends that Douglas conceded aggravators (c)(5) and (c)(8) at sentencing when Douglas's counsel twice said, "I have no comment on that aggravator," referring to (c)(5) and (c)(8). Douglas denies conceding those aggravators, arguing that not commenting on an aggravator does not constitute a concession that the State could otherwise prove the aggravator. This court has previously found concession when a defendant says he "does not dispute" an aggravator, or when a defendant agrees that an aggravator applies.[44] But we have not held that a defendant concedes an aggravator by not commenting on it.

We acknowledge that there might be logic to such a rule when applied to *mitigating* factors. The defense bears the burden of proof on mitigators, and thus a defendant's failure to make any argument in favor of a proposed mitigator might justifiably be viewed as equivalent to a concession that the proposed mitigator has no merit. *Compare Petersen v. State*[45] (holding that when a defense attorney declines to present argument in favor of a proposed jury instruction or otherwise offer a rationale for giving the requested instruction, the defendant forfeits any claim of error); *Cornwall v. State*[46] (same); *Hohman v. State*[47] (holding that when a defense attorney offers evidence which is challenged for lack of relevance, and the attorney fails to make an offer of proof concerning the potential relevance of the challenged testimony, the defendant thereby forfeits the point on appeal).

But the situation is different with respect to aggravating factors. Here, the prosecution bears the burden of proof, and a defendant's decision to decline argument concerning an aggravator does not relieve the government of its burden. We therefore reject the State's contention that Douglas's failure to offer argument in opposition to aggravators (c)(5) and (c)(8) constituted a concession of those aggravators.

The State can satisfy *Blakely* without a jury finding beyond a reasonable doubt when proof of aggravator (c)(8) relies solely on a defendant's uncontested prior convictions.[48] However, in its presentencing memorandum, the State relied on uncharged conduct and a single prior assault conviction. Although a single aggravated assault is sufficient to support aggravator (c)(8),[49] Douglas's prior fourth-degree assault conviction was not ag-

**39.** *United States v. Booker*, 543 U.S. 220, 244, 125 S.Ct. 738, 756, 160 L.Ed.2d 621 (2005) (discussing *Blakely*, 542 U.S. 296, 124 S.Ct. 2531).

**40.** 118 P.3d 17 (Alaska App.2005).

**41.** *Id.* at 21.

**42.** 143 P.3d 977 (Alaska App.2006).

**43.** *Id.* at 988.

**44.** *See Peltola v. State*, 117 P.3d 771, 773, 774 (Alaska App.2005).

**45.** 930 P.2d 414, 434 (Alaska App.1996).

**46.** 915 P.2d 640, 653 n. 11 (Alaska App.1996).

**47.** 669 P.2d 1316, 1325–26 (Alaska App.1983).

**48.** *See Milligrock v. State*, 118 P.3d 11, 15–16 (Alaska App.2005).

**49.** *Andrews v. State*, 967 P.2d 1016, 1019 (Alaska App.1998).

gravated. And under *Blakely*, the (c)(8) aggravator may not be supported by Judge Weeks's findings that Douglas had committed uncharged and unreported assaultive behavior.

The State has not argued that, on this record, the other aggravating factors found by Judge Weeks are *Blakely*-compliant. Therefore, we must remand the case for further proceedings on the statutory aggravators.

If the State is not able to establish a *Blakely*-compliant aggravator, then the superior court shall re-sentence Douglas, and transmit the amended judgment to this court. If the State establishes a *Blakely*-compliant aggravator, the superior court shall transmit the record of those proceedings to this court.

### Conclusion

Douglas's conviction is AFFIRMED. We REMAND the case for further proceedings on the aggravating factors. We retain jurisdiction.